This is a suit under the Workmen's Compensation Act, Act No. 20 of 1914, as amended, wherein it is alleged that plaintiff (a Negro about 56 years old) was employed as janitor at Louisiana State University on October 30, 1940, and for many years prior thereto, and that on the aforesaid date, while carrying a trunk up a stairway into the attic of Parker Hall, he sustained a strain which caused a potential right inguinal hernia to become strangulated; that the strangulated hernia necessitated a radical operation, performed at the Charity Hospital in New Orleans, on November 1, 1940; that to perform this operation it was necessary to make an incision of about ten (10) inches in length and to remove the right testicle and spermatic cord; that subsequent to the incarcerated hernia and the radical operation therefor plaintiff has been and remains totally and permanently disabled from doing any work of a reasonable character; that he is uneducated and the only type of work he has ever done or been able to do is hard manual labor. Plaintiff alleges further that his employer, Louisiana State University, is an incorporated public institution covered by the Compensation Act and that his employer's insurer is the defendant insurance company, a Massachusetts corporation doing business in the State of Louisiana, and he prays for compensation, at the rate of 65% of his wages, said to be $8.19 (in reality $7.60) per week, for a period of not more than 400 weeks, plus $250 for medical expenses, plus interest and all costs. The suit is against the insurance company alone.
In its answer, the defendant admitted that it was the insurer of Louisiana State University at the time of the alleged accident; that it is a Massachusetts corporation doing business in Louisiana; and that the plaintiff was employed as alleged; but denied that the plaintiff sustained any accident and denied all the other material allegations of the petition.
After filing of plaintiff's original petition and the aforesaid answer, on June 19, 1941, the case was partially tried, and thereafter plaintiff, over the objection of defendant, filed a supplemental petition making various alternative claims, and introduced evidence in support thereof; the filing of said supplemental petition and introduction of evidence thereunder being permitted by the trial judge, as he puts it, "in abundance of precaution".
The supplemental petition sets forth that the plaintiff sustained another accident in September, 1938, which resulted in the potential hernia which became strangulated in the accident of October 30, 1940; and also that a left inguinal hernia was sustained in the accident of October 30, 1940, in addition to the strangulated hernia heretofore set forth.
The trial judge rendered judgment in favor of defendant dismissing plaintiff's suit on the ground that he failed to establish, by a preponderance of evidence, that *Page 823 
he had sustained an accident, admitting however that plaintiff is at present totally and permanently disabled and has been since the last date of his employment, October 30, 1940.
Plaintiff has appealed. Defendant has answered the appeal, asking that the judgment be affirmed and also that exceptions to the supplemental petition be sustained.
It is our opinion that there is no merit to the claims set forth in the supplemental petition, and we agree with the defendant that the claims set forth therein contradict, to a large extent, the allegations of the original petition. It is not established that plaintiff sustained any accident in September, 1938, and while it is shown by the evidence that plaintiff now has a small left inguinal hernia, there is no showing as to when this left hernia developed. As a matter of fact, the evidence tends to show that the left hernia has developed since the alleged accident of October 30, 1940, and does not tend to show that it resulted from any such alleged accident. Dr. Butler, the doctor who examined plaintiff for his strangulated right hernia stated that at that time he did not notice any hernia on the left side, although he states that he made no examination of the left side, but concentrated his attention to the right strangulated hernia. Dr. O'Neil, who operated on plaintiff for the right strangulated hernia, testified to the same effect. Dr. McHugh, testifying for defendant, stated that he examined plaintiff on May 19, 1941, at which time he found the left side negative for hernia, and again on December 1, 1941, at which time he found a potential left hernia. Dr. Cook testified that he examined plaintiff on May 19, 1941, and that he believes plaintiff has a small left inguinal hernia. Because there is no proof of an accident sustained in September, 1938, and there is no proof as to when and why the left inguinal hernia developed, we do not feel that we should give further consideration to the supplemental petition, even if we should feel that the lower court was correct in permitting the filing thereof.
With reference to the original claim, however, the case presents a very difficult and close question, especially in the light of the cases of Robichaux v. Realty Operators, 195 La. 70,196 So. 23, and Biggs v. Libbey-Owens-Ford Glass Co., La.App., 170 So. 273, and cases therein cited.
It is shown by the evidence that plaintiff, a Negro of uncertain age, which can be approximated as 56 at the time of the trial, came to Baton Rouge many years ago, probably in 1912, and obtained a job at the University as janitor, which job he held until October 30, 1940. On October 30, 1940, he was employed as janitor in John M. Parker Hall. His duties consisted of scrubbing and waxing floors, sweeping, cleaning lavatories and, to some extent, moving trunks. It is shown that at the beginning of school sessions two other men were assigned to assist plaintiff in moving the trunks of incoming students and storing them in the attic, but that the moving of trunks for late students was done entirely by the plaintiff. It is also shown that plaintiff, prior to October 30, 1940, had, not only a potential right hernia as alleged in the petition, but a fairly well developed right inguinal hernia. He testified himself that a lump as big as a hen egg would at various times come out, but that he was always successful in pushing it back in until the time of his alleged accident. It is testified by Mrs. Howard, who had supervision of Parker Hall, that at various times he would take medicine to alleviate gas pains. It is clearly shown that on the afternoon of October 30, 1940, he became seriously sick with a strangulated right hernia; that he consulted Dr. Butler and that Dr. Butler, being unable to reduce the hernia, sent him immediately to the Charity Hospital in New Orleans, where he was operated on by Dr. O'Neil; that Dr. O'Neil had to keep him under anesthesia for some 2 1/2 to 3 hours, and had to perform a drastic radical operation, necessitating an incision of some ten inches in length and necessitating the removal of the right testicle and spermatic cord; that this operation had to be performed under pressure and rapidly in order to save the life of this old Negro. The preponderance of the evidence shows that, while this operation was a very excellent one under the circumstances, a weakened condition remains, particularly in the region of the upper end of the incision, and that subsequent to the operation it has not been and is not now advisable for plaintiff to perform manual labor requiring lifting or straining, although it appears that he could perform light manual work.
Some of the doctors testified that, leaving out the left hernia, plaintiff is in better condition to work now than he was before *Page 824 
his operation, when he was suffering from a right inguinal hernia. These doctors apparently testified from a theoretical standpoint, since it does not appear that they knew or examined the plaintiff prior to his operation, and the fact remains that prior to his operation he performed his work as janitor efficiently and to the satisfaction of his supervisors, and that, aside from the necessity of having to occasionally reduce his right hernia, it did not apparently interfere with his work. We agree with the conclusion of the trial judge that the testimony establishes that plaintiff has been, since his operation, disabled from doing hard manual labor and believe that he has established total permanent disability within the terms of the Compensation Act.
We also agree with the trial court that the difficult question to determine is, did plaintiff in truth and fact sustain an accident on October 30, 1940, which resulted in the strangulated hernia and the operation therefor. On that question we have the following testimony:
Thomas Rhodus, the plaintiff, testified that there was a trunk in the hall on the first floor of Parker dormitory to be removed to the attic; that in so removing the trunk he carried it by elevator from the first to the second floor, and by his own power from the second floor up a stairway to the attic; that when he got about half way up the steps of the stairway the trunk slipped and when he caught "a fresh hold of it and something gave away" in him and he suffered pain; that he finally got the trunk to the attic, became sick of the stomach, and then came downstairs and went to the men's rest room where he vomited and laid down on the floor suffering, and where he was found by one of the maids, Cornelia Hollins. He states that this occurred at about 4 P.M., and that his work day ended at 4:30 P.M., and that since he could not relieve the hernia and felt so sick, he went home shortly after going down to the men's room. He states further that he told his doctors as to how he got hurt, and also told Cornelia Hollins and Mrs. Wilkerson, Assistant Dean of Women and Director of Housing. Although at times during his testimony he states that he informed Mrs. Howard, the Supervisor of the Women's Dormitories, yet at other times he states that he did not inform her as to how he got hurt, but that some of the nurses at the Charity Hospital informed her in his presence. With reference to Mrs. Wilkerson, he stated that he informed her of his accident during Christmas and thereafter.
Cornelia Hollins, the maid, testified that her utility locker was next to the men's rest room and that on the afternoon of the accident, when she went to the locker, she heard someone in the men's rest room; that she knocked on the door, and upon being told to do so, she went in and that she found Rhodus lying on the floor apparently very sick and saw evidence of vomiting, and, upon inquiry, Rhodus told her that while moving a trunk he felt sick and had been sick ever since. She states further that she did not inform anyone about the accident, except Mr. Adams who was investigating the case for the defendant just a short time before the trial.
Dr. Butler, the doctor who examined and treated plaintiff just prior to the operation, was not questioned at all with reference to what plaintiff told him relative to the manner in which he sustained the strangulated hernia, and there is no testimony on that phase of the case by Dr. Butler.
Dr. O'Neil, the doctor who performed the operation on plaintiff, stated "In the routine history that we take on all of these patients, he informed me that this occurred while he was working".
Both Mrs. Howard and Mrs. Wilkerson denied that they were ever informed by plaintiff, or by anyone else, of any accident sustained by him, and said they had no knowledge of any alleged accident until this suit was filed, although they testified that they both knew that plaintiff had become seriously ill while at work and that they knew of his operation and subsequent condition.
It was the view of the lower court that the foregoing testimony was not sufficient to establish the alleged accident. The trial judge apparently did not believe the plaintiff's story with reference to moving the trunk, because of the absence of sufficient corroborating testimony and apparently because of the testimony of Mrs. Wilkerson and Mrs. Howard contradicting the plaintiff's testimony to the effect that they had been informed of the accident. Unquestionably these two ladies, who hold positions of trust and whose high reputation and character are well known, testified truthfully. But in addition to denying having been informed of the accident, they also testified that this old Negro janitor *Page 825 
was absolutely honest and trustworthy in every way. It would seem, therefore, that that contradiction of his testimony with reference to informing them about the accident might be explained by some other means than questioning the veracity of the plaintiff. After all, it is apparent from the evidence that the plaintiff is an illiterate Negro, of hesitant speech, and he appears to have always maintained his place as an old time Negro servant and treated his superiors with complete respect. Considering these facts, and considering the nature of his injury, it seems easy to understand that he would not have discussed the injury with Mrs. Howard and Mrs. Wilkerson in any great detail. And it is also easy to understand that he may have gotten the impression that they were fully informed of the accident even though such were not the case. The record does not reveal that either Mrs. Wilkerson and Mrs. Howard ever questioned the plaintiff directly as to how he sustained his injury. We do not feel that the denial of Mrs. Wilkerson and Mrs. Howard that they were ever informed of the accident until the suit was filed is alone sufficient to impeach the testimony of plaintiff on that question.
The defendant strongly urges the fact that the Charity Hospital history sheet failed to show that plaintiff gave any history of an accident. This, of course, is another circumstance tending to discredit plaintiff's testimony with reference to the accident, but again it is not necessarily fatal to such testimony, as in that instance also we must consider the type of individual that plaintiff happens to be, and quoting from Chief Justice O'Niell in the Robichaux case, supra [195 La. 70, 196 So. 25], "When we consider that the record was made not by the plaintiff himself — but by some one else on the information furnished by the plaintiff, and when we consider that he has less than the average degree of intelligence, — some allowance must be made for the failure to mention the accident in the recording of the history of the case".
In spite of the possible silence of plaintiff with reference to the exact manner in which he sustained his injury, the fact remains that he was alone at his work when his injury occurred and that his story thereof is entirely plausible and logical. Moreover, it is corroborated to some extent by Dr. O'Neil, Cornelia Hollins, and in that it seems to be conceded that the injury occurred during the course of his employment. It is true that Dr. O'Neil merely states that plaintiff informed him he got hurt "while working" and that he does not recall whether or not plaintiff informed him of the specific act he was performing at the time he got hurt. It is true also that Cornelia Hollins did not reveal the incident of discovering plaintiff in his injured condition in the men's room, when he informed her of his accident, until shortly before the trial, and that this fact prevented the trial judge from being impressed by her testimony. Nevertheless, it does not seem unnatural to us that this colored maid might have felt hesitant in discussing the accident with her white superiors, and we do not feel that this fact alone should completely impeach her testimony. There is no other showing in the record seeking to attack her veracity.
In view of the liberality towards the testimony of employees adopted in our jurisprudence in the Robichaux case, supra, and the Biggs case, supra, we are of the opinion that the facts and circumstances set forth herein are sufficient to establish the accident alleged by plaintiff; particularly since there is no showing that the plaintiff is unworthy of belief, but on the contrary appears to always have been a trustworthy and honest employee, and his story of the accident, while not strongly corroborated, is entirely logical and plausible.
With reference to the amount of compensation due, the petition alleges that 65% of the weekly wage amounts to $8.19. However, the evidence shows that the plaintiff received a wage of $23.40 for two weeks, which makes his weekly wage $11.70, 65% of which is $7.60. We therefore find that the plaintiff is entitled to workmen's compensation at the rate of $7.60 per week.
It is noted that the defendant contends that the pension granted to plaintiff by the University in the amount of $15.00 per month should be discounted from any compensation granted to him. We fail to see any connection whatever between this pension and the workmen's compensation.
There is no showing that plaintiff will require medical attention in the future because of his injury, nor is there any showing of medical expenses incurred by him in the past because of the said injury. His prayer for $250 for medical expenses will therefore be rejected. *Page 826 
For the reasons set forth, the judgment below is hereby reversed and judgment is now granted in favor of the plaintiff and against the defendant awarding the plaintiff workmen's compensation at the rate of $7.60 per week for a period not exceeding 400 weeks from October 30, 1940, with legal interest on delinquent installments, the defendant to pay all costs.