Plaintiff sues his employer and his employer's insurer for workmen's compensation at the rate of $11.70 per week, for a period not to exceed 400 weeks, beginning March 25, 1941, with legal interest, plus medical expenses incurred and to be incurred, alleging that on March 18, 1941, while performing services in the course and scope of his employment by Central Lumber Company, he sustained an accident which resulted in direct inguinal hernias on both the right and left side, causing permanent total disability from performing work of any reasonable character. The accident alleged is that he was carrying lumber across a pile of lumber when he stumbled and fell heavily among it, striking his hip and abdomen against some part or parts of the pile of lumber, severely straining himself in the region of his groins. The amount of compensation demanded is alleged to be 65% of his weekly wage, which is alleged to be $18 per week.
Defendants admit plaintiff's employment as alleged, and also admit that his weekly wage was $18, but they deny all the other material allegations of the petition and deny that they are liable to plaintiff in any sum.
After hearing of the case the District Judge came to the conclusion that plaintiff had proved total disability resulting from the alleged accident and rendered judgment in his favor awarding him compensation at the rate of $11.70 per week, beginning March 25, 1941, for a period not to exceed 400 weeks, with legal interest on past-due installments, plus $8.50 to cover expenses proved to have been incurred by plaintiff, plus all costs, including expert fees, fixed at $25 per each expert. The defendants filed a motion for rehearing, which was denied. After judgment being signed, defendants have appealed.
In this court defendants filed a brief in which they set forth certain phases of the case wherein they contend that the trial judge has erred, and their contentions are logically set forth and demand careful and serious consideration of the evidence, which we summarize as follows:
Dr. W.H. Cook testified that a few days before the trial he examined plaintiff at the request of plaintiff's attorney, confining his examination to the inguinal regions, and that he found that the right side had been operated on for hernia, with a good result, and that he was cured as far as the right side was concerned, and that on the left side he found a small left inguinal hernia. He testified further, in answer to a hypothetical question, that a person can have an incipient hernia which can remain incipient for a period of years, even though he may do some form of manual labor, and that then there can be imposed on that condition a jarring accident or strain which will cause the hernia to drop down and become disabling.
Matthew Claiborne, the plaintiff, testified that on March 18, 1941, while working for the Central Lumber Company, he sustained *Page 502 
a fall on a pile of 2 x 4's, when he was carrying a board and his left foot got caught under another board; that he struck himself right in the pit of his stomach; that he suffered a "pain and kind of deadlike. I had an odd feeling there". He testified that he stayed on the job for a couple of hours after his accident, but did not have much to do and that he came back the next day to resume his work, but found that he could not do so and went back home. He states that he sent for Dr. Joseph, a colored physician, after he had returned home, but that Dr. Joseph did not come to see him until a couple of days after, and that the doctor "treated me down there and told me to keep some hot cloths down there". He states that the doctor reported to Mr. Owen, his boss, after this treatment, and came back to see him, but gave him no further treatment, and that he received no further treatment until two white doctors sent by the company came to see him about three or four days later; that these doctors did not prescribe for him and gave him no medicine, and that thereafter, for some 12 or 13 days, he remained in bed and applied hot Epsom salt poultices, as directed by Dr. Joseph. He states that after staying in bed about two weeks, he was still unable to work and that he remained about the house until in August, when he went to Charity Hospital to be operated on, where he stayed about 16 days, and then returned home, since which time he has not done anything. He also testifies that in about 1938 (should be 1937) he had an accident when he fell astraddle of a joist and went to Charity Hospital, where he was told he had a hernia on the right side, but that it was not dangerous and that he refused to be operated on at that time. He states that at that time he stayed away from work about 17 or 18 days and then returned to work, and worked continuously until his accident of March 18. He testified further that he is 57 years of age and that he worked for the Central Lumber Company for the fifteen years preceding his accident, doing hard labor; that he has no education and has always earned his living by hard labor. On cross-examination he denied that he ever wore a truss before the accident, but he admits that he wore a suspensory some time after his accident of 1937. On cross-examination, also, he stated that the day after the accident he sent a colored boy to Mr. Owen, his boss, with a message that he was hurt worse than he thought and had to have a doctor, and he admits giving the boy a written message to deliver to Mr. Owen, which written message contained nothing about his condition, but merely asked for his pay. The plaintiff also admits that he did not tell his lawyer about the hernia which he had since 1937.
Mr. Harry Cockerham testified that he was employed by the Central Lumber Company on the date of the accident and that he witnessed the accident; that plaintiff was carrying a board and that he hung his feet in some lumber and it tripped him and he fell, and that he, Cockerham, asked him if he was hurt, and plaintiff answered, "Yes, Sir", and went on with the board to cut it off. He states that he fell on a lot of rippings and cut-off boards. He states that plaintiff was employed to load trucks with lumber, that this work was hard manual labor and that plaintiff was a very satisfactory worker. He also states that approximately six months before the accident plaintiff told him that he was wearing a truss and that he saw the outline of something through plaintiff's clothes that he took to be a truss. He admitted, however, that what he took to be a truss could have been a suspensory and that he does not know whether plaintiff knew the difference between a truss and a suspensory. With reference to the fall, he testifies that plaintiff fell forward.
Cyrus Slaughter testified that he has been employed by the Central Lumber Company since December, 1933, and that on March 18, 1941, he saw plaintiff trip and fall face forward on a pile of lumber consisting of rippings and cut-offs. He also testifies that he would consider plaintiff a very dependable worker.
Dr. James R. Godfrey testified that he examined plaintiff on April 15, 1941, and again on September 29, 1941, and that he found, on his first examination, that he was all right except for high blood pressure, an occasional irregularity of the heart rhythm, a direct right inguinal hernia about the size of a hen's egg that would descend down through the inguinal canal, almost to the scrotum; that the left external inguinal ring was also relaxed, but not nearly as much as the right; that on passing the examining finger up the inguinal canal on the left side, it was debatable as to whether or not an impulse could be felt; that it was a borderline case as far as the left side was concerned and that it either was a very small left side inguinal hernia *Page 503 
or what would be called a potential hernia. He states that the right hernia was moderately advanced. He states further that plaintiff gave him a history of carrying a heavy board and slipping and falling forward, hitting his chest and abdomen and that a sudden increase in abdominal pressure could cause a hernia, and he could have landed when he fell so as to cause a hernia. He states that in his second examination he found that the hernia on the right side had been corrected surgically, and that as to the left side, while he could not see any external bulging, on having plaintiff cough or bear down, he did get the impression that a little hernia did touch the internal examining finger. In answer to a question as to whether or not plaintiff suffered a left hernia at the time of his accident, Dr. Godfrey made the following statement: "Well, that's pretty hard to answer in a fair way. I can say that in my own mind I think that this man originally years ago had a bi-lateral weakness in his inguinal regions. Some strain or injury caused the right weakness to develop into a frank hernia and at the same time that samestress obviously must have been felt on the left side becausethere is no reason to think an abdominal strain would affect oneside more than the other, so that probably whenever this injurydid take place the left side was relaxed even more than it hadbeen before." (Italics ours.) He recommends a hernioplasty on the left side and considers that hernia totally and permanently disabling without an operation, that is, for heavy labor, such as picking up, packing and loading timber. Dr. Godfrey's testimony seems to be to the effect that as a result of his accident, a pre-existing right inguinal hernia was aggravated, and a small, or potential left inguinal hernia was created, which testimony relative to a potential left hernia was created and thereafter became a frank hernia has not been contradicted.
He also states that he considers plaintiff totally disabled from a standpoint of pre-employment examination, and that as a matter of fact, he could work where a pre-employment examination is not required as long as the left inguinal hernia remains small. Dr. Godfrey makes the further statement: "Any injury that would be severe enough to cause his right side to burst through from pressure would certainly have put additional strain on the left side, and I don't see any reason to think a man could have worked for years doing heavy work up to the date he was finally injured without developing a hernia and then going home and lay around a number of months, not working, and develop a hernia under those conditions without that left side having been injured, having been weakened at the time of the accident".
Dr. Harrison C. Joseph testified that he examined plaintiff on March 20, and saw him almost every day from March 20 to March 29; that plaintiff complained of pain in the lower abdominal region, and that he examined both sides and found on the right side a large mass the size of a large walnut, and found a relaxed ring on the left side that accommodated the index and middle fingers, but that he did not find an impulse in the left inguinal ring. He states that he advised an operation; that he could not reasonably return to work and that he asked plaintiff if he had gotten in touch with his employer about his inability to work, and that plaintiff told him he had done so, but that his employer was somewhat antagonistic to his complaints; that plaintiff asked him to talk to his boss and that he accordingly talked to Mr. Owen about the case, and that Mr. Owen tried to get into a long conversation with him, but he told Mr. Owen that he was merely delivering a message to the effect that plaintiff had a rupture and that plaintiff claimed he fell down two or three days before while on his job. Dr. Joseph stated that the first time he saw plaintiff was at plaintiff's house; and he denied that he had informed Mr. Adams, representative of the insurance company, that the first time he had seen plaintiff was at his office.
Dr. T. Jeff McHugh testified that he examined plaintiff on May 12, 1941, and on the day of the trial; that on May 12 he found plaintiff's right inguinal ring to be large and thin, with a complete right oblique inguinal hernia which descended to the lower portion of the scrotum; that the hernia was reducible and that plaintiff was well versed in reducing it; that the left inguinal region was thin, the ring of average size, and also thin; that when the finger was inserted within the ring, there was an impulse on coughing. He concluded on that examination that there was a complete large right oblique inguinal hernia, which was reducible, but that since there was no extrusion through the ring on *Page 504 
the left side, that therefore was not the necessary criteria to diagnose a hernia of the left side, "the doctor stating that Dorland's Medical Dictionary defines hernia as the protrusion of a loop or knuckle of an organ or tissue through an abnormal opening". He states that on his second examination, on the day of the trial, he found that the right side had been operated with good results, and that the left side, as on the previous examination, was thin in the inguinal region, and that there was no extrusion outside of the ring, but on inserting the finger within the ring, an impulse could be obtained upon coughing.
Dr. J.T. Lewis testified that he examined plaintiff at plaintiff's residence on March 28, 1941, at the request of the insurance company; that plaintiff gave a history of having hurt himself a few days before from a fall while carrying lumber, and that physical examination of plaintiff was negative, except for a large right scrotal mass; that from examination of the right side his impression was that this mass had slipped up and down numerous times. With reference to the left side he states that on his first examination he could admit the tip of the index finger into the left ring, but that there was no hernia present. In his second examination he found that the right side had been successfully operated on and that the left side had thinned out, but that he could not feel any complete hernia. He explains this thinning out by stating that the plaintiff is a year older. This doctor also testifies that hernias generally are not caused by trauma and advances the theory that hernias are caused by congenital weakness, stating that he had had only one case where trauma actually caused a hernia where there was enough there to see. His theory, as remarked by the trial judge in his written reasons for judgment, is certainly contrary to the theory of the great majority of doctors.
Mr. W.F. Owen testifies that he is president and manager of the Central Lumber Company, and he contradicts Dr. Joseph's testimony to the effect that he had delivered a message with reference to plaintiff's accident and injury; that his first notice of plaintiff's claim was from Mr. Blakey Adams, representative of the insurance company. He states that he did receive a note from plaintiff asking for his "time", but that the note contained no message with reference to plaintiff being sick or hurt. Mr. Owen admits that plaintiff was a good worker.
Mr. Robert E. Black testified that he is a clerk in the lumber company office and that the morning following the accident plaintiff told him he had fallen the day before and hurt his leg and wanted to go home; that he went away limping; that he said nothing about a hernia or rupture. He states that plaintiff was a dependable, obedient and courteous worker.
Napoleon Brown testified that he was a fellow employee of plaintiff; that on one occasion he saw plaintiff with his trousers down and that he saw a belt on him, two or three inches wide, which looked to him like a truss or rupture belt. When asked by the court if he knew the difference between a suspensory belt and a truss belt, he said that he had never seen a suspensory belt. He admits that he saw the belt from a distance and through some bushes and from the left side only; that it looked like a brown belt.
In addition to the above-summarized evidence the record contains a stipulation to the effect that if Dr. I. Ashton Robins were called as a witness by the plaintiff he would testify that at the request of the plaintiff's attorney he examined plaintiff at plaintiff's residence and rendered the report attached to the stipulation, and that he examined plaintiff the second time on February 2, 1942, and reported that plaintiff's right inguinal hernia had been corrected satisfactorily and that on both examinations the condition of plaintiff's left inguinal region was the same; that is, there was an enlarged or relaxed inguinal ring on Claiborne's left side, but no evidence of hernia, and that the condition on the left side was such that it was potentially susceptible to a hernia.
It was further stipulated that if Blakey Adams were called by the defense he would testify that in May, 1941, he questioned Dr. Joseph, who informed him that plaintiff called at his office on March 20, 1941, and told Dr. Joseph that he had fallen and hurt himself; that Dr. Joseph stated that he examined plaintiff the day after at his residence and found, upon examining him, that he had a large inguinal hernia on his right side, and a small inguinal hernia on his left side; that upon informing plaintiff of his condition, plaintiff told him, the doctor, that he did not know what hernia meant, and did not know that anything was wrong with him. *Page 505 
The evidence is conclusive that plaintiff, prior to the accident, had a right reducible hernia. This, in so far as the compensation law is concerned, totally disabled plaintiff from doing hard manual labor. The evidence does not show wherein the accident aggravated this hernia to any great extent. It did not cause the hernia to become strangulated, necessitating an immediate operation as we found in the case of Rhodus v. American Employers Ins. Co., La.App., 9 So.2d 821. We are therefore of the opinion that compensation cannot be granted for this right hernia, but a different situation exists in so far as the left hernia is concerned. The evidence is conclusive that prior to the accident, plaintiff was not suffering from a left hernia. The most that can be said is that plaintiff may have had relaxed rings. The preponderance of the medical testimony is to the effect that the fall sustained by the plaintiff caused these rings to be more relaxed, causing a potential hernia, which later developed into a frank or a real hernia; which is compensable under our law. This was the conclusion of the trial judge, and we find no manifest error therein.
For these reasons, the judgment is affirmed.