JESS JOHNSON, Judge.
The City of New Orleans has appealed from a judgment of the Civil District Court for the Parish of Orleans in favor of the plaintiff and decreeing maximum workmen’s compensation for total permanent disability.
Plaintiff was a police officer with the rank or grade of lieutenant with seventeen years service. On or about December 19, 1952 (the evidence is indefinite as to whether that date was December 14th or December 19th), at about 3:30 o’clock p. m., plaintiff was on duty with Charles Maitre,, another police officer, when they were dispatched 'in the scope of their employment to a barroom in the vicinity of Bourbon and St. Peters Streets to quell a disturbance in the barroom. Upon arriving the plaintiff and Officer Maitre found two other off-duty police officers in the barroom, who were pointed out as the parties who were creating the disturbance. Plaintiff and Officer Maitre placed the two men under arrest. While still in the barroom one of the men under arrest made a lunge to strike another person, but instead and apparently by accident struck the plaintiff a blow on the side of the neck near the Adam’s apple. It was necessary for plaintiff to use his night stick to subdue the arrested officer. Whereupon, the arrested men were placed in the police wagon by plaintiff and Officer Maitre.
Plaintiff said that after having received the blow in the episode in the barroom there was a bruise and discoloration on his neck. He developed a headache the next day and within a few days he felt a weakness in his right arm while bowling. Plaintiff continued in the performance of his duties as a police officer until late in the afternoon of December 25, 1952. On that occasion plaintiff and Officer Maitre arrived at the police station and left their automobile to walk into the station. Officer Maitre noticed that plaintiff was staggering and plaintiff complained of being dizzy. A doctor and an ambulance were called and plaintiff was sent home and to bed. Dr. Chetta administered a sedative. Within a few days plaintiff’s condition was such that he was sent to Mercy Hospital where he remained a month, most of the time in a coma. He became paralyzed in his right side and suffered complete loss of speech. Dr. Chetta diagnosed his ailment as being cerebral thrombosis with aphasia. About the time plaintiff went home from the hospital Dr. Chetta was replaced by Dr. Montelepre who attended plaintiff until March 28, 1955, when the doctor referred plaintiff to Dr. John A. Colclough, an expert neurosurgeon.
On March 28, 1955, Dr. Colclough took a complete history of the case and examined plaintiff on that day and again on November 25, 1955. At the time of the trial Dr. Montelepre was deceased, and, of course, could not testify. Dr. Colclough was the only medical witness called on behalf of plaintiff.
*873 The history given Dr. Colclough was, briefly, that on December 19, 1952, plaintiff was struck forcibly on the side of the neck near the Adam’s apple by the edge of a man’s hand a knife-like blow. The following day plaintiff said he -had a headache and that the next day he had difficulty in coordinating his right hand. He continued to perform his duties as a police officer until December 25th, when he became very sick and was taken home. He told Dr. Col-clough that he was unconscious for about thirty days and when he recovered consciousness he could not speak, but could understand, and could not move his right arm and leg. In March 1953 he could walk «orne with the aid of a crutch. In July 1953 he was able to say “yes” and “no”. From about that time plaintiff was administered phsyiotherapy, occupational and voice therapy, which resulted in some improvement of his general condition. When Dr. Col-clough saw him in 1955 he could walk short distances without a stick and his ability to speak had improved to the extent that he could make himself understood fairly well, though his testimony at the trial revealed that he was still having difficulty in that regard.
Dr. Colclough said in his testimony on the trial:
“ * * * Upon neurological examination I found that the cranial nerves revealed an inconstant inequality of. the pupils, the left pupil being greater than the right. There was right facial points of central type weakness of the right eleventh cranial nerve in function ; upon walking his gait was spastic and he threw and dragged his right foot and carried the right arm in flexion.
“The Romberg sign was positive and I found weakness and spasticity of the right side and consistent ankle glomus and patellar glomus on the right side. The right Babinski sign was positive. The cerebellar signs were negative; he had a motor aphasia there was some astereognosis on the right, and I could find no pulsation of the left common exr-ternal or internal carotid arteries.”'
He said further that “The diagnosis is that' of thrombosis of the left common external and internal carotid arteries, the result of injury by a blow to the left side of the face.” The doctor was asked if he found a definite relationship between the blow referred to above and plaintiff’s physical condition. The doctor answered: “There is a very definite and, I would say, absolute causal relationship. The history is typical of that of a progressive thrombosis of the right common internal and external carotid arteries caused by such a blow.” He said the condition is permanent and totally disabling.
The defense offered no medical testimony and the cross-examination of Dr. Colclough was very brief. He was not questioned at all in regard to his diagnosis and the causation. Counsel for defendant reminded the doctor that the date of the blow on the neck had been given to the doctor as December 19, when there was some testimony that the date might have been December 14, but the doctor said that the causal relationship and the end result would be the same.
Plaintiff became disabled on December 25, 1952, and there is no dispute that he remained totally incapacitated and was still in that condition at the time of the trial of this case on June 26, 1962. This suit was not filed until March 16, 1956. Counsel for defendant rests his appeal for reversal of the judgment on defendant’s plea of prescription filed in limine, which the court first referred to the merits at the request of both counsel, and which the court overruled after the trial but before rendering judgment for plaintiff at the completion of the trial.
It was stipulated by agreement that from December 25, 1952, plaintiff’s payroll record kept by an employee of the police department carried plaintiff on varied status for each of various periods, as follows: Sick leave with full pay to March 12, 1953; annual leave with full pay from March 13 *o June 5, 1953; with full pay for com *874 pensatory time from June 6 to June 29, 1953; sick leave with full pay from June 30 to October 15, 1953; sick leave without pay from October 16, 1953, to January 20, 1954; return to duty with full pay from January 21, 1954 to July 27, 1955; sick leave with full pay from July 28 to September 9, 1955, and annual leave with full pay from September 10 to October 20, 1955. Apparently he received no pay from October 21 to November 30, 1955. He was retired with twenty years service with fifty per cent of full pay on December 1, 1955. He then drew retirement pay from that date. The only periods for which the plaintiff failed to receive full pay after December 25, 1952, ran from October 16, 1953, to January 20, 1954, (thirteen weeks and six days) and from October 21 to November 30, 1955, (five weeks and six days) a total of nineteen weeks and five days.
The defendant offered in evidence payroll cards marked with certain letters of the alphabet to indicate the designation of status of plaintiff after December 25, 1952. These cards were nothing more than self-serving notations made without any request or agreement by the employee. They are inadmissible and cannot be considered as evidence.
It is not disputed that the checks sent to this plaintiff after December 25, 1952, were the usual and regular payroll salary checks, worded the same as the payroll salary checks he had received for services rendered during his tenure of over seventeen years. He said they did not contain any words or figures to indicate that they were payments for sick or annual leave and that he had never made any application or request for sick or annual leave. The checks were not offered in evidence and there was no testimony to contradict him. We accept his statements as true. Plaintiff did not earn the salary he received after December 25, 1952. Under these circumstances the court must recognize the existence of an implied agreement that the full salary payments were in lieu of compensation. Carlino v. United States Fidelity & Guaranty Co., 196 La. 400, 199 So. 228; Carpenter v. E. I. Dupont De Nemours & Co., La.App., 194 So. 99; Scalise v. Liberty Mutual Insurance Company, La.App., 84 So. 2d 88.
There is no evidence that plaintiff during his seventeen years service made any money contribution to any fund from which employees may receive compulsory benefit payments while on sick or annual leave from work. No state law or city ordinance has been cited which makes compulsory payments of full salary to a member of the police department while he is sick or disabled.
LSA-R.S. 33:2420, with reference to Civil Service in New Orleans, provides that: Rules shall provide for annual and sick leaves with or without pay or with reduced pay and may allow extended leaves for employees disabled through injury or illness arising out of their employment.
Just what the rules of the New Orleans Civil Service Board provide in that respect we are not informed. The full salary payments of this plaintiff were not earned and were entirely gratuitous. Plaintiff is not entitled to the salary and workmen’s compensation both during the time full salary was paid. The decision in the case of Walters v. General Accident and Fire Assur. Corp., Ltd., La.App., 119 So.2d 550, discussing the status of a City of Boga-lusa fireman, took occasion to say that it is well settled by the courts of this state that payment of unearned wages is a gratuity and the employer is entitled to workmen’s compensation credit of one week of compensation for each week during the time such unearned wages are paid, citing Scalise v. Liberty Mutual Insurance Company, La. App., 84 So.2d 88.
Counsel for defendant is correct in his contention that payments to an employee, who, at his request or by agreement with his employer, is on sick or annual leave, or who is being paid under an annuities and *875 benefits plan to which the employee has contributed, would not interrupt the running of prescription to extend the statutory limitations in which a suit for workmen’s compensation must be filed, nor do such payments under those circumstances entitle the employer to compensation credits. But here, at least for some weeks after plaintiff became disabled, he was unconscious and not mentally competent to make a request or agreement to be carried on the payroll as on sick or annual leave. He said that he never made any such request ayd was never notified that the employer intended to make the payments of his full salary for any other purpose than for straight salary. It is not reasonable nor lawful that the employer continue without interruption to pay a disabled employee full wages by customary salary payroll checks and at the same time secretly note on its payroll records that the payments are only for sick or annual leave benefits. We understand the law to be that the voluntary payment of a disabled employee’s salary, not earned, shall be construed to have been paid under an implied agreement that the payments were in lieu of workmen’s compensation.
Defendant further argues that the plaintiff did not notify the defendant that he was disabled as a result of the blow he received while on duty at the barroom on December 14th or 19th, and gave no notice of his intention to file claim for workmen’s compensation. The police department is an administrative agency of the executive department of the City of New Orleans and information within the knowledge of the officials of the police department with regard to the facts in this case is sufficient notice to the defendant, the City of New Orleans. Witnesses for the defendant testified that the officials of the police department had made an investigation and had full information that plaintiff had been struck at the barroom and that he became totally disabled some six or ten days thereafter. Whether the department contemplated a causal relationship of the disability to the injury is not important. We can only assume that such relationship was established, because the department had medical advis-ors in its employ, though there is no evidence that the department physician ever examined the plaintiff. One of the defendant’s witnesses, an employee of the police department, testified that the superintendent of police made the applications to1 the Civil-Service Board for the extended sick and annual leaves for plaintiff, which had to be done on a certificate of the police department doctor. He said the department was supposed to have obtained information as to what is wrong with a sick employee in order to know how to fill out the certificate to the Civil Service Board. The superintendent of the police was not authorized by plaintiff to make such applications. If the superintendent had legal authority to determine and control the status of plaintiff as an employee, then, undoubtedly, the superintendent should have notified the employee of the change of status, which was not done. Therefore, the arbitrary action of recording plaintiff as being on sick or annual leave will not be recognized or enforced by the court. If the department was not informed from any source that there was an actual or possible relation of the disability to the injury and that plaintiff would claim compensation benefits, there is no proof that the absence of such notice or knowledge prejudiced the defendant in any way. The workmen’s compensation law says, in part (LSA-R.S. 23:1295): “* * * want of notice or delay in giving notice shall not be a bar to proceedings under this Chapter if it is shown that the employer, or his agent or representative, had knowledge of the accident, or that the employer has not been prejudiced by such delay or want of notice.”
It is well to explain in regard to the notation by the defendant that from January 21, 1954, to July 27, 1955, the plaintiff was returned to duty with full pay, the evidence shows that for one hour each workday the plaintiff was transported' to the detention home, where he sat for an hour *876 without any duties being assigned to him to perform. It is possible that he was a watchman or something of that sort, though there is no testimony that he performed any duties whatsoever. For that he was carried as having returned to full duty status and for which he continued to receive full salary. It is evident that the salary was not earned.
Similar facts and questions of law arising from such facts have been before our appellate courts a number of times. Interesting law review articles have been written about them. It would be appropriate here to give the historical development of the discussions in those authorities, but for the fact that Judge Albert Tate has already done that very thing in the opinion of which he was the author in the case of Scalise v. Liberty Mutual Insurance Company, La. App., 84 So.2d 88, where it was held that the continued payment of full wages to a disabled employee would serve to interrupt the running of prescription. That suit was filed more than four years after the accident causing the disability. We quote the following paragraph from that decision:
“The basic reason for the rule enunciated is that the payment of full wages for the performance of lighter work constitutes a recognition by the parties that the employee has a just claim for compensation, see Stiles v. International Paper Co., [Ltd.], La.App., 39 So.2d 635, at page 637. An implicit reason for the rule is the social wisdom of encouraging the employer to retain and to rehabilitate his injured employees, thus furthering the ends of the Act to compensate for loss of earning power due to industrial accident. If the employee is arbitrarily required to file suit before the year is out, his continued employment and rehabilitation is jeopardized. On the other hand, the humanitarian employer is rewarded by receiving credit against his compensation liability, even if the wages are also partially earned.”
That decision has not been overruled and has been cited with approval in several cases involving the same questions. Bynum v. Maryland Casualty Company, La.App., 102 So.2d 547; Walters v. General Accident and Fire Assur. Corp., Ltd., La.App., 119 So.2d 550; Griffin v. Liberty Mutual Insurance Company, La.App., 131 So.2d 153; Fruge v. Hub City Iron Works, Inc., La. App., 131 So.2d 593.
The plaintiff received but did not earn his salary every month from December 25, 1952, to December 1, 1955, when he was retired, except he was not paid during nineteen weeks and five days running in two periods, one from October 16, 1953 to January 20, 1954, and the other from October 20, 1955, to November 30, 1955. During that nineteen weeks and five days the defendant paid nothing, and now owes workmen’s compensation for those two periods.
LSA-R.S. 33:2294 provides that if an officer of the New Orleans police department has twenty years service and retires he shall receive fifty per cent of his wages as a pension. Plaintiff’s retirement pension is, therefore, fixed by law and he is entitled to receive it free of any workmen’s compensation credits. In Rhodus v. American Employers Insurance Company, La.App., 9 So.2d 821, an employee of Louisiana State University was awarded a judgment for workmen’s compensation for total permanent disability. He was also paid a pension by the University of $15.00 a month. Counsel for defendant argued that the compensation payments should be discounted by the amount of the pension. The court said there was no connection. Haskett v. Shreveport, La.App., 17 So.2d 385.
The judgment appealed from grants workmen’s compensation at thirty dollars per week for four hundred weeks beginning March 16, 1956, subject to a flat credit of one hundred fifty seven weeks as already paid. We cannot reconcile this decree with the evidence and the judgment will be amended and recast.
*877 Therefore, the judgment appealed from is amended and recast to read as follows:
It is ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Joseph Rimbolt, Jr., and against the defendant, The City of New Orleans, for the payment of workmen’s compensation at the weekly rate of thirty dollars for a period not to exceed four hundred weeks beginning December 26, 1952, with legal interest on each unpaid weekly payment from its due date until paid, subject to compensation credits as already paid at thirty dollars per week for the period from December 26, 1952, to October 15, 1953, and like credits for the period from January 21, 1954, to October 20, 1955, and for all costs. It is further ordered that the judgment as amended is hereby affirmed, the defendant to pay the costs.
Amended and affirmed.