## MONARCH RUBBER CO. ET AL. *v.* PHILIP WEINSTEIN

[No. 430, September Term, 1975.]

*Decided January 6, 1976.*

The cause was argued before ORTH, C. J., and MORTON and LOWE, JJ.

*John J. Hirsch,* with whom were *Francis B. Burch, Attorney General, J. Howard Holzer, Special Attorney, Charles R. Goldsborough, Jr., Assistant Special Attorney* and *Paul J. Reed, Jr.* on the brief, for appellants.

*Stanford H. Franklin,* with whom were *Gary A. Schapiro* and *Mandel, Rocklin, Franklin & Drue* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

## STATEMENT OF THE CASE

On 19 March 1970, Philip Weinstein, an employee of the Monarch Rubber Co., sustained an accidental personal injury arising out of and in the course of his employment. Monarch secured workmen's compensation to its employees by insuring the payment of such compensation in the State Accident Fund. On 12 June 1970 the Workmen's Compensation Commission found that Weinstein was temporarily totally disabled as a result of the injuries. It ordered the employer and the insurer to "Pay unto the said claimant compensation at the rate of $55.00 per week, payable weekly, during the continuance of the temporary total disability of the claimant, subject to the provisions of the Workmen's Compensation Law; compensation to begin on the 23rd day of March, 1970; provided, however, that if the injury results in disability of more than 28 days, compensation shall be paid from the date of disability, including the day on which the injury occurred, unless the employee was paid wages for such day; subject to credit for days for which wages were paid in full during temporary total disability; and subject to credit for days claimant worked and received regular wages during temporary total disability, if any; and rate of temporary total disability in excess of 42 days in the aggregate shall be $80.51." Monarch, however, paid Weinstein his full wages in the amount of $155 per week until 13 February 1971. After that date, the Fund paid Weinstein $80.51 per week until 18 March 1974, which date was four years after the injury was sustained. From 13 February 1971 to 30 July 1972, Monarch paid Weinstein the difference of $74.50 between the award and his salary. The record does not reflect why Monarch discontinued its supplementation. On 24 April 1974 there was a hearing before the Commission on the issue "Has the

claimant's temporary total compensation benefits under Section 36 Paragraph 2, of the Workmen's Compensation Law terminated as of March 19, 1974? " as posed by the Fund, and on the "Nature and extent of disability" as posed by Weinstein's attorney. On 10 June 1974 the Commission entered a "Supplemental Award of Compensation". It found that Weinstein "was temporarily totally disabled from February 19, 1971 to date and continuing. . . ." It amended the order of 12 June 1970 "to read that the claimant's temporary total disability began on February 19, 1971; and further ORDERED that Monarch Rubber Company, employer, and State Accident Fund, insurer, pay unto Philip Weinstein, claimant, compensation for temporary total disability beginning February 19, 1971 to date and continuing; said compensation to be paid at the rate of $55.00 per week for the first 42 days of temporary total disability and to be paid at the rate of $80.51 per week for the period of temporary total disability in excess of 42 days, in the aggregate; . . . ." The Fund requested a re-hearing, claiming that it was an error of law to find that the temporary total disability began on 19 February 1971 rather than 20 March 1970. Upon re-hearing on 3 July 1974 the Commission concluded that there was no error in law and on 22 July 1974 affirmed its order of 10 June 1974. Monarch and the Fund, feeling aggrieved by the order of 22 July, prayed the Baltimore City Court to review the action of the Commission as permitted by Code, art. 101, § 56 for the reason that the "Commission has not justly considered all the facts concerned, and has misconstrued the law and facts applicable to this case." [1] Weinstein answered, claiming that the Commission was correct in construing the law and the facts applicable to the case. Monarch and the Fund submitted as the issue to be determined: "On what date did

---

1. Code, art. 101, § 56 (e) provides, *inter alia:* "If a motion for rehearing is filed, the time within which an appeal can be taken from the decision shall commence from the time of the ruling by the Commission on the motion. . . . If the appeal shall be heard subsequent to the ruling by the Commission on the motion, then the court shall determine all questions of fact and law arising under the original order or under such order, or orders as the Commission may have made pursuant to such motion."

the temporary total disability of the Claimant, Philip Weinstein, commence, as a result of his accidental personal injury of March 19, 1970?" Upon trial of the case on 12 March 1975 in the Baltimore City Court without a jury, the decision of the Commission was affirmed, and judgment *nisi* was entered in favor of Weinstein for costs. Judgment was made absolute on 17 March. Monarch and the Fund appealed to this Court.

## ISSUE FOR DECISION

The issue for decision is whether Monarch and the Fund should be given credit as temporary total disability payments for the wages paid by Monarch to Weinstein from 19 March 1970 to 13 February 1971.[2]

## THE LAW

It once was that Code, art. 101, § 36 (2) included a provision that compensation for temporary total disability was "in no case to continue more than six years from the date of the injury or to exceed five thousand dollars in the aggregate." Annotated Code of Maryland (1957). By Acts 1961, ch. 698, "six years" was changed to "four years" and "from the date of the injury or to exceed five thousand dollars in the aggregate" was stricken. The law then read that compensation for temporary total disability was "in no case to continue more than four years." By Acts 1968, ch. 743, the provision was amended by adding the words "in the aggregate". At the time Weinstein suffered his injury, § 36 (2) of art. 101 prescribed that compensation for temporary total disability was "in no case to continue more than four years in the aggregate." [3] We find it clear from the history of § 36 (2) of art. 101 that it was not the legislative intent after

---

**2.** No question is raised about the monies representing the difference between the award and the wages which Monarch paid to Weinstein from 13 February 1971 to 30 July 1972.

**3.** The clause "but in no case to continue more than four years in the aggregate" was stricken from the law by Acts 1971, ch. 402. Section 2 of the Act declared "that this Act shall not apply to accidental injuries or occupational diseases occurring prior to July 1, 1971."

1961 that compensation for temporary total disability could continue only for four years from the date of the injury. It could continue for "four years in the aggregate."

"Compensation" under art. 101, § 67 (5) "means the money allowance payable to an employee or to his dependents as provided for in this article, and includes funeral benefits provided therein." See *Uninsured Employers' Fund v. Booker*, 13 Md. App. 591, 598 (1971).

## DECISION

We believe that it was within the discretion of the Commission, upon a finding that Weinstein was temporarily totally disabled on 19 February 1971 to award compensation therefor to begin as of that date rather than as of the date of the injury, provided that Monarch or the Fund had not, in the meantime, paid workmen's compensation benefits to Weinstein under the order of 12 June 1970. That is, if no payments by way of compensation had been paid before 19 February 1971, the Commission could require them to be paid for four years from 19 February 1971, provided, of course, that Weinstein was temporarily totally disabled for that period. This would be in accord with the liability imposed by art. 101, § 36 (2), and, if the compensation for the temporary total disability continued for not more than four years in the aggregate, neither Monarch nor the Fund had ground to complain. The question is, therefore, the status of the payments made by Monarch to Weinstein for the eleven months from 19 March 1970 to 13 February 1971.

The court below found as a fact that the monies received by Weinstein for the period 19 March 1970 to 13 February 1971 were gratuitously paid by Monarch.[4] The court held as a matter of law that monies so gratuitously paid by an employer do not satisfy its liability to pay compensation

---

4. The court said: "The employer, whether because of the loyalty of the employee in making himself available to help, even though he was seriously injured, or because of its gratuitous desire to protect a good employee, elected to pay his salary for eleven months."

under the Workmen's Compensation Law.[5] We hold that the court below was not clearly erroneous in its judgment on the evidence, Maryland Rule 1086, and was correct in its construction and application of the law. See *Dent v. Cahill,* 18 Md. App. 117 (1973); *ABC Day Care Center v. Browne,* 17 Md. App. 470 (1973).

The court discussed the evidence before it:

"The record and the testimony taken show that the claimant was a trusted and valued employee. During the eleven months he was paid his full salary by his employer, he was on call for consultation with his replacement, and at least on one occasion went to the factory to assist in setting up the operation he had been supervising.

The evidence indicates that even after the insurer began to pay temporary total, the employer made up the difference of his salary. At the time of the hearing the employer was paying life insurance and health insurance benefits for the employee even though he had not worked for more than four years."

This was a fair capsule description of the evidence. It was not disputed that Weinstein performed no regular tasks for Monarch after his injury. He did not appear at Monarch's plant on any but very infrequent and irregular occasions. Milton Seidman, Secretary of Monarch, testified that Weinstein had worked for Monarch for over ten years. He operated a machine and had seven or eight persons under his supervision. After he was injured he came to the plant once in January or February of 1971 because the man who had taken his place died and the vice-president and the superintendent of the company "wanted to get some things straightened out. They wanted to talk to him about the operation of the machine, at that time, because the two men

---

5. The court said: "I do not believe it was the intention of the legislature to thus unjustly enrich the Fund. . . . The Fund should not be permitted to deprive the employee of his full benefits because of the employer's largess."

who were leading the crew were out. He was out and the other fellow had died suddenly, and they spoke to him about an hour what he would suggest, and I understand he went out in the plant and suggested a few things, and that was it." Other than that one occasion, Weinstein did not do any "work". Seidman made plain that the reason Monarch continued to pay Weinstein his full salary was because Weinstein had been "a good employee", whose "good will" Monarch was anxious to retain, and whom it wanted back when he was able to work. Seidman also gave as a reason for continuing the salary, "insurance purposes. We knew if we continued his pay to him this would reflect in the money we paid to the State Accident Fund for the insurance, and it would help us with our experience rating." The primary motivation for paying the salary was made manifest on cross-examination of Seidman by Weinstein's attorney. Counsel asked: "In other words, what you had given him was a pure gift as far as you were concerned?" Seidman replied:

> "Well, I'll tell you. We knew Phil a long time. We knew him before he came to Monarch Rubber Company, when he was with Chesapeake Shoe Company, and we knew this was a traumatic experience to him; on top of the fact there were other things that happened to him while he was in the hospital. In our long friendship with him, we didn't want to add to his discomfort, so we continued to pay him." [6]

On this evidence, it is manifest that the evidence was sufficient in law to support a finding that the payments made for the eleven month period were gratuities.

In holding that the monies paid to Weinstein by Monarch

---

6. In sustaining an objection to a question asked at one point in the cross-examination the court said: "It's quite clear on the record that Mr. Weinstein was a valuable employee as well as a person with close personal relationship, and that's the reason the money was paid, apparently. The witness indicates that is unusual, as far as he was concerned." This was a fair statement, we believe, and we note that its propriety was not disputed.

during the eleven month period did not satisfy the liability to pay compensation under the Workmen's Compensation Law, the court below expressed the belief that "As between the injured employee and the insurer who has been paid a premium for his insurance, if gratuitous payments are made they should inure to the benefit of the employee rather than the insurer." It observed: "Neither counsel nor the court have found any decisions on this point [in Maryland]." [7] A. Larson, *The Law of Workmen's Compensation,* volume 2 (1975), discusses the issue arising when the employee draws full wages for a time after his injury and then is awarded compensation. According to Larson, the rule is: "If the payment of wages was intended to be in lieu of compensation, credit for the wages is allowed." § 57.41. He points out: "However, since there is seldom any direct evidence on whether such an intention lay behind the payment, it must be inferred from the circumstances surrounding the payment." *Id.* According to Larson, § 57.42, "The most important of these circumstances is the question whether the injured man really earned his wages. If he is paid his regular wage, although he does no work at all, it is a reasonable inference that the allowance is in lieu of compensation. An occasional court will say that such a payment is to be deemed a grauity, but this, in the absence of special facts indicating a charitable motive, is unrealistic. . . . The same principle should logically apply when the employee is given light or reduced work at his old pay. If that rate of pay is not ordinarily offered to workers performing those duties, the expenditure can only be explained as provision of regular financial benefits to a work-injured man — in other words, workmen's

---

7. The court noted: "The only cases which might be held to be analogous to the instant case are those which follow the opinion of the Court of Appeals in *Plank v. Summers,* 203 Md. 552 [1954]." That case, as the court below pointed out, held that a tortfeasor is liable to the injured party for damages in an amount that is not affected by any other sources of help or reimbursement the injured party may have. The Court of Appeals apparently adopted as the modern majority rule that an injured person may recover for wages lost and medical expenses incurred during his incapacity even though such amounts were supplied by insurance, a contract of employment, or gratuitously. *Id.,* at 559. See discussion of the point at 556-562.

compensation. * * * By contrast, if the employee is giving a dollar's worth of labor for every dollar he is paid, the intention of the employer cannot be said to be that of supplying a substitute for workmen's compensation; it is simply to purchase these services from this man on the same terms as from any other man. Therefore, credit is usually disallowed when it can be shown that the claimant earned the wages he was paid during the period in question." (citations omitted).

We have examined representative cases on the point from other jurisdictions. No matter what result they reached, we think it fair to say that generally they are consistent with the "intention" principle used by Larson as the key to that entire class of cases. In other words, it is the intention of the employer, shown directly or inferred from the circumstances, which is the underlying principle.[8] By the great weight of authority, credit against compensation liability is denied when independent evidence shows that the payment to the employee by the employer was meant to be neither compensation nor wages, but was gratuitous. Larson, § 57.44. We do not mean "gratuitous" here in the sense of "unearned wages" as it is used by some courts,[9] but as freely given as charity, impelled by neither a wage nor a workmen's compensation obligation. We have found that the judge below was not clearly erroneous in his judgment on

---

8. For examples of cases in which credit has been allowed against compensation liability, see: Herrera v. Workmen's Compensation Appeals Board, 455 P. 2d 425 (Calif. 1969); Martin v. Travelers Ins. Co., 200 So. 2d 141 (La. App. 1967); Carpenter v. Employers Mutual Liability Ins. Co., 178 So. 2d 486 (La. App. 1965); Murphy v. Baton Rouge Coca Cola Bottling Co., Ltd., 165 So. 2d 636 (La. App. 1964); Howard v. Globe Indemnity Co., 147 So. 2d 912 (La. App. 1962); Rimbolt v. New Orleans, 150 So. 2d 871 (La. App. 1963); Walters v. General Accident and Fire Assurance Corp., Ltd., 119 So. 2d 550 (La. App. 1960); Lion Oil Co. v. Reeves, 254 S.W.2d 450 (Ark. 1952); Daoud v. Matz, 73 So. 2d 51 (Fla. 1954); Carlino v. U.S.F. & G., 199 So. 228 (La. 1940).

For examples of cases in which credit has not been allowed against compensation liability see: Southwestern Bell Tel. Co. v. Siegler, 398 S.W.2d 531 (Ark. 1966); Looney v. Sears, 371 S.W.2d 6 (Ark. 1963); Trzoniec v. General Controls Co., 216 A. 2d 886 (R. I. 1966); Modern Equipment Co. v. Industrial Commission, 20 N.W.2d 121 (Wis. 1945); Middleton v. City of Watertown, 16 N.W.2d 39 (S. D. 1944); Hartford Accident and Indemnity v. Hay, 17 S.W.2d 904 Tenn. 1929).

9. See Baker v. Standard Rolling Mills, 131 N.Y.S.2d 739, 741 (1954).

the evidence that the payments Monarch made to Weinstein for the eleven month period were gratuitous in the sense we here use that word. It follows, therefore, that the judge was correct in ruling that those payments would not be applied as a credit against the liability for workmen's compensation.

Some of the cases in other jurisdictions allowed payments made by the employer to the employee to be credited against compensation liability because of a controlling statute.[10] Maryland has two statutes which relate to offsets of payments against workmen's compensation benefits. One, Code, art. 101, § 33, provides that benefits furnished employees of the State or any other political subdivision thereof shall satisfy and discharge *pro tanto* or in full, as the case may be, the liability or obligation of such employer for any workmen's compensation benefit. We construed and applied this statute in *Nooe v. Mayor and City Council of Baltimore*, 28 Md. App. 348. It is not applicable to the case before us. The other, Code, art. 101, § 19 (a) prescribes:

> "Every policy of insurance covering the liability of the employer for compensation issued by a stock company or by a mutual association authorized to transact workmen's compensation insurance in this State, shall contain a provision setting forth the right of the Commission to enforce in the name of the State of Maryland for the benefit of the person entitled to the compensation insured by the policy either by filing a separate application or by making the insurance carrier a party to the original

---

10. See, for example, the Louisiana Statutes Annotated — Revised Statutes, 23:1206, "Voluntary payments: deduction from benefits", which provides:

"Any voluntary payments made by the employer or his insurer either in money or otherwise, to the injured employee or his dependents, and accepted by the employee, which, by the terms of this act, were not due and payable when made, may, subject to the approval of the court, be deducted from the payments to be made as compensation; provided, that in case of disability, such deduction shall be made by shortening the period during which compensation shall be paid, and not by reducing the amount of the periodical payments."

application, the liability of the insurance carrier in whole or in part for the payment of such compensation; provided, however, that payment in whole or in part of such compensation by either the employer or the insurance carrier shall to the extent thereof be a bar to the recovery against the other of the amount so paid."

We do not agree with the view of Monarch and the Fund that this statute operates to compel a credit against compensation benefits of the payments made by Monarch to Weinstein during the period 19 March 1970 to 13 February 1971. The statute concerns only "compensation" paid. As we have indicated, Code, art. 101, § 67 (5) defines "compensation" as "the money allowance payable to an employee or to his dependents as provided in this statute. . . ." We have found that the payments here made were not "compensation" but gratuities. Therefore, they were without the ambit of § 19 (a).[11]

*Judgment affirmed; appellants to pay costs.*

---

**11.** We note that § 19(a) speaks only of a policy of insurance covering the liability of an employer for compensation "issued by a stock company or by a mutual association authorized to transact workmen's compensation insurance in this State. . . ." We have serious doubt that the State Accident Fund, Code, art. 101, §§ 70-84, is encompassed within § 19 (a) in any event, because it does not appear to be either a stock company or a mutual association. In the light of our holding, however, that the subsection is not applicable to the payments here considered, we need not reach the point and expressly do not decide it. It may be that the legislature intended to exclude the Fund from the provisions of § 19 (a), but if it did not, it may desire to consider clarifying language.