LOTTINGER, Judge.
This is a Workmen’s Compensation proceeding which originated as a result of an injury sustained by the plaintiff on June 6, 1964. On the date of the accident, the plaintiff was employed as a structural technician by the Chrysler Corporation at its Michoud Plant in New Orleans, Louisiana. It is undisputed that the duties of the plaintiff come within the purview of the Workmen’s Compensation Act and that his wages at the time of the accident were sufficiently large so as to qualify him for benefits in the amount of $35.00 per week.
The record discloses that on June 6, 1964, while the plaintiff was using a portable grinder, the vibration of the grinder caused a clamp which was hung on a workbench to shake loose and fall on the foot of the plaintiff, striking him principally on the second toe of his left foot. He was taken to the medical department at Michoud where his foot was placed in ice water and subsequently X-rayed. At that time the company doctor also bound all of the plaintiff’s toes together and prescribed some pain medication for him. He was referred by the Michoud medical department to the Houston Clinic where he was treated by Dr. Grunsten. Mr. Martin testified that his treatment at that clinic consisted of ultrasonic water treatment, which afforded him temporary relief. Dr. Grunsten applied a metatarsal bar on the bottom of the plaintiff’s shoe and discharged him in October of 1964. Mr. Martin’s testimony is that he thereafter requested additional medical treatment from his employer because his foot was continually bothering him. He was later referred to Dr. Cahen in New Orleans for evaluation. Thereafter, Mr. Martin consulted with his attorney and began consulting Dr. Haslam, who was still treating the plaintiff at the time of the trial.
The plaintiff testified that at the time of the trial his foot was still giving him a considerable amount of trouble in that it affects him constantly in his walking and *143 standing. He testified that there are many activities which he could perform prior to the accident that he cannot perform now and specifically testified that he has not been able since the date of the accident to perform the work which he was doing at the time of the accident. The reason given by him for this inability is that he does not have the requisite balance and strength in his foot. His duties at the time of the accident involved work on an Atlas missile which was 90 feet tall and required a considerable amount of walking of steel beams and platforms high above the ground as well as the use of rung-type ladders.
Immediately after the accident, the plaintiff ceased doing the work that he had been doing at the time of the injury and was assigned to a workbench sitting on a stool building a model test stand and a model spider beam of the test that was going to be performed, which he testified in effect was a model building job. He continued in these duties until September of 1964, at which time he was transferred to another department by his employer. His duties in the new department did not entail prolonged standing, walking, or any climbing whatsoever, but was primarily desk work. In the interim between the plaintiff’s injury and the time of the trial, he received several salary increases, some of which were attributable to his transfer to another department, and some of which were automatic periodic increases.
Mr. Martin was originally employed by Chrysler in October of 1962 as a quality control inspector, and he remained in that position until April of 1964 at which time he was promoted and taken into the Structural Testing Department because of some difficulty which he had had with his supervisor in that department.
A fellow employee of the plaintiff testified that he had been working with the plaintiff on the day that he was injured, and that while he was no longer with Chrysler, he did see the plaintiff approximately twice a week. He testified that since the date of the plaintiff’s injury he had never seen him at any time when he did not limp. He did also testify that during the period when he and the plaintiff did both the same work, their work did require a large amount of climbing on structural steel, walking steel beams which were approximately 18 inches in width, and performing all of these functions at a height of approximately 30 feet above the ground.
The record discloses that the plaintiff was graduated from the Spartan School of Aeronautics in 1941, attended numerous technical schools in the United States Air Force during World War II, and thereafter was employed by Douglas Aircraft Corporation. He attended training programs in specific instructions in quality control, progressed to technical reading and instruction, and eventually to general dynamics which he testified provided him with the cyrogenic and pyrotechnic and technical training necessary for missiles and space vehicles. He testified that he also attended Chrysler’s school in white-room procedures quality control.
One of Chrysler’s employment representatives, Mr. Canaga, testified with reference to the plaintiff’s employment with Chrysler and specifically with reference to the change in jobs which the plaintiff had undergone in September of 1964 from a test and development technician to a job of manufacturing specifications man. He testified that the latter position was a higher rated salary job which would have and did create an immediate salary increase for the plaintiff as well as a change of department. He testified that the change also was from a manual type of work to a more mental type of work, and also said that transfers of this type were quite often made. He said that these were made in instances where a man who had done manual work had certain skills which could be utilized in higher classified jobs. He cited the example of manual workers who have the capability of reading blueprints as well as the ability to work with different types of mechanical equipment. He testified that *144 these persons became quite valuable because as above average type mechanics with extra knowledge who could work into semi-engineering classifications, they made valuable employees because of their first-hand knowledge of what must transpire in a shop. He classified the plaintiff as one of these persons who had the ability to work with his hands manually as well as sufficient technical knowledge to enable him to perform this semi-engineering type of work. Mr. Canaga testified that on several occasions he had noticed the plaintiff walking without a limp.
With reference to the transfer of the plaintiff in September of 1964, there is testimony in the record to the effect that there were five candidates for this particular job and that each of them were interviewed prior to selection. Mr. Canaga testified that Mr. Martin was the best qualified applicant of the group interviewed for the job. He stated that the plaintiff was a very good mechanic, that he had an above average degree of intelligence and was precisely the type of shop employee that Chrysler likes to promote into the semi-engineering positions.
The supervisor of the manufacturing specifications unit to which plaintiff was transferred in September of 1964 testified as to the duties of the plaintiff and as to the training which the plaintiff had to be given after the transfer. He testified that within a week after the transfer, the plaintiff was actually doing a portion of the work and that the 30 day and 60 day evaluation rendered on the plaintiff showed that his work was above average.
Another employee of Chrysler testified that he had seen the plaintiff walk on several occasions with no limp whatsoever and that whenever the plaintiff saw him he would commence limping.
The Chrysler employee who was the plaintiff’s supervisor at the time of the accident testified as to the injury and that the plaintiff had requested a transfer from his department on June 17, 1964. He also testified, under cross examination, as to the various duties involved in the particular job that the plaintiff was performing at the time of his injury, and testified that the job required climbing to heights as high as 65 feet and that the job also involved walking of narrow ledges of beams.
The plaintiff testified that he had requested a transfer to another department about three weeks after being transferred into the structural area, and that his request was denied by his supervisor. He also testified that after his injury he again requested a transfer because of his inability to perform his duties because of the condition of his foot. He stated that this request was also denied initially, but was subsequently granted in September of 1964. He testified that he had been unable to walk without limping since the injury, and that on some days it was worse than others.
The medical evidence in the record consists of written medical reports from Drs. Soboloff & Grunsten addressed to the medical officer at Michoud and the Travelers Insurance Company, which, by stipulation between plaintiff and defendant constitute the testimony of Drs. Soboloff & Grun-sten. There is also the deposition of Dr. Edward Haslam, the physician who treated the plaintiff, and whose deposition was offered on behalf of plaintiff.
The reports of Drs. Soboloff & Grunsten show that their initial opinion was that plaintiff sustained a compression injury to the second toe of his left foot and perhaps some contusion of the dorsum of the forefoot. The report confirms the plaintiff’s subjective statement relative to pain experienced on normal walking activities. On the date of the initial examination, July 21, 1964, Dr. Grunsten stated that he was unable to account for the degree of soreness described by the plaintiff with reference to his second toe. He was seen later on August 26, 1964, by Dr. Soboloff at which time he complained of tenderness between the second and third metatarsal heads. In general, although his foot showed a full *145 range of motion, direct pressure in certain spots on the forefoot elicited pain. The calf of the left leg was one-half inch smaller than the right. In the report dated August 27, 1964, Dr. Soboloff recommended that the plaintiff be removed from the job on which he was then occupied if at all possible by reason of the fact that it required a great amount of walking.
Thereafter, on September 10, 1964, Mr. Martin saw Dr. Grunsten at which time the same tenderness was found over the metatarsal heads as had been present previously. In this report, Dr. Grunsten mentions that the plaintiff’s basic problem is apparently one of metatarsalgia, which might or might not have been aggravated by the contusion injury to the foot.
The plaintiff next saw Dr. Grunsten on October 16, 1964, at which time the plaintiff complained of pain over the entire forefoot, extending to the ankle region distally to the tips of his toes. An examination of the plaintiff on that date revealed that the calf measurements of the two legs were identical. Dr. Grunsten observed in this report that the plaintiff’s complaints had become somewhat bizarre. He stated that considering the amount of limping which the plaintiff alleged, that there should certainly be some atrophy in the calf musculature, whereas there was none at all. He concludes his report of October 16, 1964, by the statement that he is unable to explain the subjective complaints related by the plaintiff, and that from an orthopedic standpoint, he had no further recommendations for treatment.
The last examination of the plaintiff was conducted by Dr. Soboloff on January 27, 1966, at which time he reviewed the history of his and Dr. Grunsten’s treatment of the plaintiff which resulted in the plaintiff’s discharge by Dr. Grunsten on October 16, 1964, and compares X-rays taken of the plaintiff’s foot on January 26, 1966, with X-rays taken on September 10, 1964, and finds them to be identical in that neither of them disclose any evidence of disease, fracture, infection, or any other bony abnormality. The report concludes with the statement that the plaintiff has subjective complaints of pain without objective finding.
Dr. Haslam, an orthopedist, testified that he had seen the plaintiff on four occasions, commencing on February 16, 1965, and the last time on November 13, 1965. He related the plaintiff’s subjective complaints relative to pain in his foot which continued beyond the time that he was discharged by Dr. Grunsten in October of 1964. He stated that when he examined the plaintiff he found that he walked with eversion of the left foot, that is, turned out and pointed away from the midline, and testified that this was abnormal and was consistent with the patient’s complaint of pain in the forefoot. He also testified that the circumferential measurements of the thighs, ankles and feet were equal and that the circumference of the right calf was 15 inches and the left calf was 14 and ½ inches. The left foot showed a full range of motion of all joints distal to the knee, although the plaintiff complained of pain on full flexion of the second, third and fourth toes. He testified that Mr. Martin complained of pain on metatarsal compression and that there was an extreme point of tenderness on the sole of the foot in the interval between the second and third metatarsal heads. He testified that he made a tentative diagnosis of either metatarsalgia due to muscle weakness in the forefoot subject to injury, or as a second possibility a plantar neuroma or Martin’s Toe. Metatarsalgia is defined by Dr. Haslam as pain in the forefoot caused by a fallen transverse arch of the foot. Martin’s Toe is described by Dr. Has-lam as a more advanced stage of metatar-salgia. The doctor testified that Mr. Martin did not relate any improvement during the entire period that he treated him, although he described more trouble with his foot at some times than at others. He mentioned that as far as the difference in circumference of the calves of his legs were concerned, there was a half-inch difference *146 noted on his second examination and no difference noted on his last examination. The doctor testified that a person who is suffering from metatarsalgia or Martin’s Toe who was climbing on scaffolding would be in greater danger of falling because of the pain in the foot than a person without the injury.
After a trial on the merits, the District Judge rendered judgment in favor of the plaintiff and against the defendant, wherein he found that the plaintiff was totally and permanently disabled and awarded him 400 weeks of compensation. It is from this judgment that the defendant has appealed, alleging five specifications of error which are as follows:
1. That the Trial Court erred in not sustaining defendant’s exception of no right or cause of action on the ground that plaintiff returned to work subsequent to his injury and received total wages;
2. That the Trial Court committed manifest error in not finding that plaintiff did not sustain the burden of proving a causal connection between the injury and the alleged disability;
3. That the Trial Court committed manifest error in failing to find that the plaintiff had no bona fide complaint of the disability alleged to be attributable to the injury;
4. That the Trial Court committed manifest error in finding that the plaintiff was totally and permanently disabled from doing work of any reasonable character;
5. That the Trial Court committed manifest error in not holding that defendant is entitled to a credit of one week’s compensation for each week that plaintiff has been previously or is hereafter paid wages by his employer in an amount equal to or in excess of compensation.
The plaintiff answered the appeal and prayed that the judgment rendered in his favor be amended so as to condemn the defendant to pay the 12% penalty and reasonable attorney fees as prayed for in the original petition on the basis that the defendant arbitrarily and capriciously and without probable cause refused to pay the Workmen’s Compensation benefits.
With reference to appellant’s first specification of error, the overruling by the Trial Judge of the exception of no right or cause of action filed by the defendant at the conclusion of the trial based upon the ground that the plaintiff continue to receive his regular salary, appellant cites to us the case of Carlino v. United States Fidelity & Guaranty Company, 196 La. 400, 199 So. 228 (1940), as authority for the proposition that a suit brought by an injured employee for compensation for a period during which he is paid wages equal to or exceeding in amount the compensation claim would be unavailing not on the ground of its being premature, but because there would be no cause or right of action for compensation for that period. We distinguish the Carlino case from the case at bar because during the period when Carlino was paid these wages by his employer, these were wages paid in lieu of compensation. Carlino’s injury consisted of a hernia and an operation was performed to correct the condition. Carlino continued to work in the interim between the development of the hernia and the operation, however, the bulk of his work was done by fellow employees and he did not in substance earn the wages which he was paid. In the case at bar, with the possible exception of the period between the date of the plaintiff’s injury and the date of his transfer to a different department, the plaintiff did in fact work and fully and completely earn his salary. The representatives of Chrysler testified that a man with Martin’s manual ability who possessed the technical training that Martin also possessed was a very valuable employee to them and one whom they wanted to promote from purely manual labor to a more technical type of work because of his knowledge of both the technical and manual aspects of the job. We therefore see a very clear distinction between *147 the Carlino case and the instant case, in that the wages paid in the Carlino case were clearly in lieu of compensation whereas in the instant case they were earned by the plaintiff.
With reference to appellant’s second specification of error relative to the Trial Court’s not finding that Martin did not sustain the burden of proving the connection between the injury and his disability, we can only say that the medical evidence available, which consists solely of reports from Dr. Soboloff and Grunsten on the one hand, and the deposition of Dr. Haslam on the other convince us that the plaintiff did sustain the burden of proof. The medical reports filed on behalf of defendants by Drs. Soboloff & Grunsten continually confirm the complaints of pain, tenderness, and soreness made by Martin with reference to specific portions of his foot. Only in the latter of the reports do those doctors state that they can find no clinical findings to support the subjective complaints of pain. Dr. Haslam, whose deposition was filed on behalf of the plaintiff, testified as to the same pain, tenderness, etc. in the same specific areas of the foot gave what he classified as a tentative diagnosis, and also testified that the difficulty was occasioned by the injury. We believe that with the testimony of Dr. Haslam the plaintiff has successfully borne the burden of proving the connection between the injury to his foot and his disability. The plaintiff testified that prior to the accident he had had no difficulty whatsoever with either of his feet, although he did admit that he was flatfooted and had been prior to the accident. Appellant quotes to us jurisprudence in his brief to the effect that the plaintiff in a compensation case bears the same burden of proof and is required to establish his claim with the same reasonable certainty and by the same preponderance of the evidence that a plaintiff would have in other civil cases. We thoroughly agree with this proposition, but believe that the plaintiff in this instance has sustained the burden of proof.
The third specification of error is that the Trial Judge committed manifest error in failing to find that Martin had no bona fide complaint of the disability alleged to be attributable to the injury. Appellants’ argument with reference to this particular specification is concerned with Martin’s testimony that he was flat-footed even prior to the accident, testimony of Chrysler’s representative to the effect that Mr. Martin had not stated on his employment application that he was flat-footed, and the testimony of several fellow employees with reference to Martin’s alleged behavior in limping when he thought he was being watched and walking without a limp when he did not believe that anyone was watching him. Appellant argues that any complaint of disability that Martin alleged is attributable to pre-existing condition of flat feet and not to the injury which occurred to the second toe on the left foot. We can only answer this argument by pointing out that Martin’s duties, which he had performed without any difficulty prior to the injury, consisted of being on his feet all day long, with the exception of a 30 minute lunch break. There is nothing in the record to indicate that Martin ever experienced any difficulty whatsoever in performing his duties prior to the injury.
The fourth specification of error assigned by appellant is alleged by reason of the Court’s finding that Martin was- totally and permanently disabled from doing work of any reasonable character. They argue that Martin is not totally and permanently disabled within the meaning of the compensation act by reason of the fact that he had the requisite technical skill and training and was qualified to do the work which he was doing subsequent to the accident. The record indicates that Mr. Martin, in his new job, is responsible for reviewing the process sheets which are initiated by production engineers. He takes these process sheets, compares them with engineering documents, with drawings when necessary, and based on his interpretation of these documents he creates data which is fed into the computer *148 at the computer facility for making bills of material. The testimony is to the effect that Martin’s experience and prior knowledge qualified him for the interpretation of process sheets because of his previous experience with the structural parts of the missiles. The secondary portion of Martin’s job was the creating of computer input and that it was this function for which he had to be trained. Appellant makes the statement that the evidence shows that Martin is not disabled to do work for which he “is suited by training and experience or to do work of a similar character”, nor is he in an employment of “a different kind and not requiring any special skill or training”. As one of its arguments in support of this proposition, appellant urges the salary increases which have been received by Martin since his injury and change of job. We do not believe that the increase or diminution of Martin’s earning capacity is of any consequence in relation to his ability to perform the work which he was performing at the time of his injury. Appellant cites to us the case of Mottet v. Libbey-Owens-Ford Glass Company, 220 La. 653, 57 So.2d 218 (1952) wherein the Supreme Court stated:
“It is well established that disability to do work of a reasonable character is deemed total whenever it appears that the injury causes a total disability to continue carrying on the trade or work for which the employee is suited by training and experience or to do work of a similar character * * * ”
Appellant also cites other cases which stand for the proposition that disability to do work of any reasonable character within the intendment of the statute means “disability to perform work of the same or similar description, kind or character (not necessarily the identical position) to that which the claimant was accustomed to perform or was undertaking when the injury occurred.” and, in addition, a statement of the Supreme Court in Brannon v. Zurich General Accident & Liability Insurance Company, 224 La. 161, 69 So.2d 1 (1953) which is as follows:
“There is of course, no hard and fast rule that can be layed down for guidance in the application of this rule to the limitless variations of fact presented to the courts. Each case must stand on its own peculiar facts.”
Applying these various rules which have been established by the Supreme Court to the facts of the case at bar, it is our opinion that this injury did cause a total disability in Martin to continue carrying on the work for which he was suited by training and experience and a concurrent disability to do work of a similar character. We believe that the trade or work for which Martin was suited by training and experience prior to the accident was, on the basis of the record, principally manual labor, with a portion of this manual labor being directed toward inspection of work done by other workmen. Indeed, we note that at the time that he was injured, the work which he was performing was entirely manual in nature. The work which Martin was doing at the time of the trial and which he had been doing since September 14, 1964, was that of a workman who reads blueprints, calls upon knowledge gained by him of the practical manual labor requirements necessary to implement those blueprints and finally, the assembly of his interpretation of the manual work requirements as gleaned from the blueprint into data assembled in such a manner so as to be utilized by Chrysler’s computer center. It is our appreciation of the testimony with reference to Martin’s duties that he assembled data to be placed into computers, and that this assemblage was based upon his reading of blueprints and practical knowledge of the manual labor necessary to be applied to those blueprints to produce a desired result.
This function, we believe, is sufficiently remote from the duties being performed by Martin at the time of his injury so as to not be characterized as even work of a similar *149 character. Martin’s duties at the time of his injury were entirely manual and involved extensive physical activity such as climbing, crouching, walking, etc.. His duties on his present job are obviously much more highly sophisticated than those involved in the job which he was performing at the time that he was injured.
With reference to the question of training necessary for the new job undertaken by Mr. Martin, the testimony in the record indicates that Mr. Martin is by reason of his manual labor and experience, as well as certain technical training which he had received prior to and during World War II was basically equipped to perform a portion of the duties of his new job which entailed reading of blueprints and interpretation thereof to the extent of determination as to the amount of labor and/or materials necessary for a manual laborer to implement those blueprints. Mr. Martin and the other witnesses testified that he did require a reasonable amount of training in the method of arriving at these conclusions, and required extensive training in the method of assembling all of this data in a proper manner for insertion into the computer. The fact that the training required an extensive period of time is indicated by the fact that there were progress checks on his capability in the new job made as long as 60 days after he commenced performing the duties.
We are therefore of the opinion that Martin within the definition of “disability to do work of any reasonable character”, as defined by the Supreme Court, was in fact disabled to do work of a reasonable character by this accident.
The final specification of error urged by appellant is that they are entitled to a credit of one week’s compensation for each week that plaintiff has been previously paid or is hereinafter paid wages by Chrysler in an amount equal to or in excess of compensation due subsequent to June 6, 1964, the date of the injury. In support of this proposition he cites to us the case of Cruthirds v. Hartford Accident & Indemnity Company, La.App., 159 So.2d 586 (1963), a case emanating from this Court. In that case, Cruthirds, a skilled instrument technician, while in the employ of a chemical company, received an injury to the distal end of the left middle and ring fingers of his left hand, which necessitated amputation of the terminal phalanz of the left ring finger. Subsequently, he returned to his job and was able to perform it only by virtue of his extra effort and determination. In that case we held that the plaintiff was unable to perform his duties in the usual and customary manner, and accordingly was totally and permanently disabled to perform the duties of an instrument technician. We believe that the facts of this case are clearly distinguishable from the Cruthirds case, in that the plaintiff here did not return to his old job, but rather was trained for and accepted a new job in which his disability was not a factor. Martin fully and completely earned the wages paid him by Chrysler from and after September 14, 1964. Appellants also cite to us the case of Scalise v. Liberty Mutual Insurance Company, La.App., 84 So. 2d 88 (1955), a case emanating from this Court, as authority for the proposition that the retention of an injured employee at lighter duties creates an implied agreement between the injured employee and the employer that subsequent wages are paid in lieu of compensation as a matter of law. Again, we distinguish the case at bar from the Scalise case because in the case at bar Martin was not retained at lighter duties, but was rather retrained for a different job which in itself paid higher wages. The wages paid to Martin after September 14, 1964, were not in the nature of a gratuity and were not wages in lieu of compensation, but were wages fully earned by Martin.
However, we do note that in the interval between June 6, 1964, the date of the injury, and September 14, 1964, the date of Martin’s transfer to -the new job, Martin clearly was unable to' earn the wages which were being paid to him. We therefore believe that the appellant is entitled to a credit for one week’s compensation for each week *150 during the period between June 6, 1964, and September 14, 1964, for which plaintiff was paid wages by his employer in an amount equal to or in excess of compensation due.
With reference to appellee’s claim for penalties and attorney fees on the ground that defendant’s refusal to pay compensation was arbitrary, capricious and without probable cause, which relief was denied by the Trial Judge, we believe that in this case there was a bona fide and serious dispute as to the appellant’s liability for compensation and for credit if compensation was due, and that because of this dispute, plaintiff is not entitled to penalties and attorney fees.
Accordingly, the judgment of the Trial Court is amended, and as amended is affirmed.
Judgment amended and affirmed.