293 So.2d 536 (1974)
Santo PANEBIANGO
v.
MAIN INSURANCE COMPANY.
No. 6079.
Court of Appeal of Louisiana, Fourth Circuit.
March 8, 1974.
Rehearing Denied May 10, 1974.
Writ Refused June 21, 1974.
*538 Henson, Waldrep & Williams, P. C., Columbus, Peter G. Williams, New Orleans, for plaintiff-appellee.
Nelson, Nelson, Garretson, Lombard & Rothschild, Michael A. Dessommes, New Orleans, for defendant-appellant.
Before SAMUEL and SCHOTT, JJ., and MARCEL, J. Pro Tem.
SCHOTT, Judge.
Defendant, the Workmen's Compensation carrier of plaintiff's employer, has appealed from a judgment awarding plaintiff compensation for total and permanent disability with interest at 8% per annum on each past due installment, from its due date until paid, subject to a credit of 55 weeks, with all accrued amounts to be paid in a lump sum together with the sum of $3,621.38 for medical and drug bills and with penalties and attorney's fees by reason of defendant's arbitrary and capricious refusal to pay compensation.
Plaintiff was employed by C. G. Smith Company, a heavy construction business, as a crane operator and a field foreman. On October 26, 1970, he was injured in the course and scope of his employment as a result of an explosion which caused him to sustain severe burns over a large area of his body. He was initially treated by Dr. Arthur W. Owens, a specialist in internal medicine, and Dr. James D. Day, a plastic surgeon. He was initially hospitalized from the date of the accident until December 19, 1970, and returned to work in March, 1971. When Dr. Day last saw the plaintiff on February 26, 1971, it was his recommendation that plaintiff be provided with additional skin grafts so as to release contractures which had developed in the area behind the knee, but at that point plaintiff decided to consult another physician, Dr. Duncan M. McKee, for whatever further treatment might be required.
After recounting in detail the complicated surgery he had performed on plaintiff, Dr. Day testified:
"I would like to make and maybe add one or two comments, if I could. This was a most difficult case because of the extenuating circumstances but I believe this patient had received a very excellent result and I see no reason why he cannot continue working."
The doctor went on to say that there was some residual permanent and functional disability as a result of plaintiff's injuries which he estimated as 20 or 25% located primarily in the lower extremities and to some extent in his left elbow.
Dr McKee first saw plaintiff on July 21, 1971, when he was complaining of itching on the areas of the scars and burns, pain in the left elbow and pain in the back of the knees on each side. Upon examination the doctor found hypertrophic scars of the medial and lateral posterior left knee and tightness of the skin at the back of the right knee so that extension of the knees was limited. He concluded that plaintiff needed excision of the scar contracture of the left posterior knee with resurfacing with a skin graft and release of the scar contracture of the right posterior knee also with a skin graft. He admitted plaintiff to the hospital on October 17, where these surgical procedures were carried out. Because of a partial loss of the skin graft plaintiff was operated on again on November 4. He was discharged from the hospital on November 13, 1971, and was treated by Dr. McKee on eight visits thereafter, the last of which was on October 17, 1972.
*539 As of that date the skin grafts and scars had matured and the patient had full range of motion of both knees. But he complained of multiple areas of discomfort of the legs and the lower thighs and some loss of sensation in the legs. The doctor testified that such complaints were not unusual and that it takes a matter of years for discomfort and unusual sensations to disappear from a burned area. In answer to the question whether plaintiff was able to operate a crane, the doctor testified as follows:
"I thought about this a good bit. Mr. Panebiango had asked me many times whether he could expect to return to his previous occupation and he described it as well as he could to me, and about the only answer that I could give him was that he was just going to have to wait and see. And then it would be at least another year from the time that I last saw him, October, '72, before he could expect to reach his maximum improvement. I simply don't know, and I don't think he will know what his physical status will be for approximately another year.
". . . .
"Well, with extensive scarring, some degree of discomfort may well persist permanently, it varies with individuals and is difficult to predict whether they will have any permanent discomfort. On the lower extremities it's particularly true that when the legs are in a dependent position discomfort is more likely than on a more upper part of the body, because with the legs in dependency, in everyone, in the normal person blood tends to stagnate in the lower extremities, the circulation is not as good, so that as I understand it operating one of these machines requires sitting on the seat and using the feet to move pedals with a fail amount of force, this may well entail some permanent discomfort in someone who has been extensively burned on the lower extremities."
Plaintiff testified that between the date that he returned to work in December, 1971, after his last hospitalization he tried to operate the crane several times and in each instance his legs "would go to sleep" and he would have pain in his legs. He described the operation of the machine as requiring the use of two foot pedals which he could not accomplish for a longer period than an hour at a time. His testimony was corroborated by the testimony of his employer, Charles G. Smith, to the effect that the operation of a crane does entail the use of one's legs in connection with two brake pedals, and that plaintiff had generally complained to him that he had difficulty in this connection. He further stated that since the accident plaintiff has never operated the crane for any periods approaching a normal daily shift.
While defendant has not conceded that plaintiff is disabled from the operation of the crane its primary argument is to the effect that plaintiff was not totally and permanently disabled because the operation of the crane was only secondary to the duties plaintiff performed in his capacity as a foreman.
The evidence shows that from the time the plaintiff returned to work in March of 1971 he worked without interruption as a foreman until the date of the trial on November 21, 1972, except for the period when he was hospitalized on October 17 until December, 1971. Furthermore, plaintiff was paid his full salary for the entire period between the date of the accident and the date of the trial. Defendant paid Workmen's Compensation benefits from the date of the accident through November 12, 1971, and by agreement between plaintiff and his employer the compensation payments he received during this period were turned over to the employer. Plaintiff filed his suit on February 29, 1972.
We are satisfied that on the date of the plaintiff's accident he was employed in a dual capacity as a crane operator and *540 a foreman of a pile driving crew. As a result of the accident, he was, on the date of the trial, disabled from functioning as a crane operator. The question is whether, under these circumstances, he was totally and permanently disabled so as to be entitled to Workmen's Compensation payments even though he was being paid his full salary and was functioning as a foreman when defendant discontinued the compensation payments.
In Lindsey v. Continental Casualty Company, 242 La. 694, 138 So.2d 543, the Supreme Court held that an employee was entitled to compensation for total and permanent disability after suffering the loss of sight in an eye even though he had continued to work for his employer and had been promoted from his original job as a mechanic to a shop foreman at an increase in pay. The Court held as follows:
"Under the jurisprudence it is established that a skilled worker is deemed totally disabled within the intendment of the law if he is unable to do work of the same character as that which his training, education, and experience qualify him to perform, without unusual difficulty or danger. This rule is applicable to a skilled worker who cannot perform a substantial portion of the work incident to his special occupation. The fact that he may be able to perform the work through assistance does not alter the result. The law looks only to the occupational capacity of the injured employee."
In Martin v. Travelers Insurance Company, 200 So.2d 141 (La.App. 1st Cir. 1967), the Court held that plaintiff was entitled to compensation for total and permanent disability where he was originally a structural engineer and was rendered incapable of climbing to heights and performing other aspects of his work but was promoted to a desk job and continued to be employed as of the date of the trial. The Court decided the case on the legal basis set forth in Mottet v. Libbey-Owens-Ford Glass Company, 220 La. 653, 57 So.2d 218, where the Supreme Court stated:
"It is well established that disability to do work of a reasonable character is deemed total whenever it appears that the injury causes a total disability to continue carrying on the trade or work for which the employee is suited by training and experience or to do work of a similar character ...."
Finally, in Zimmerman v. United Machinery Corporation, 208 So.2d 336 (La. App. 4th Cir. 1968), this Court held that a washing machine mechanic who was rendered incapable of working with small tools and parts as a result of an injury but who could do much of the work his job originally entailed was nevertheless disabled within the meaning of the law and entitled to compensation benefits.
Since a substantial part of plaintiff's employment was the operation of the crane and since, at least at the time of the trial, he was no longer able to perform these duties without substantial pain he was entitled to be compensated for total and permanent disability notwithstanding the fact that he continued to function as a foreman. From the cases cited, it is also clear that defendant is not entitled to a credit for that which plaintiff has earned as a foreman since December of 1971, because these wages were earned by him as a foreman and were not unearned payments to him in lieu of compensation.
Next, defendant specifies error on the part of the trial judge in awarding penalties and attorney's fees for its arbitrary refusal to pay compensation. It relies on Martin v. Travelers Insurance Co., supra, contending that the imposition of penalties and attorney's fees is prevented because of the presence of a bona fide dispute between the parties; Courville v. Ashy Construction Co., 207 So.2d 910 (La.App. 3rd Cir. 1968); Ware v. Blue Grass Liquor Co., 232 So.2d 893 (La.App. 2nd Cir. 1970), and Jones v. Southern Tupelo Lumber Co., 233 So.2d 264 (La.App. 1st Cir. 1970), for the proposition that the penalties are not imposed where the treating physician *541 encouraged the claimant to return to work; Miller v. General Chemical Division, 128 So.2d 39 (La.App. 1st Cir. 1961), as authority for the proposition that penalties are not assessed where the employee returns to his same job after the injury, and Antoine v. Houston Fire & Casualty Co., 232 So.2d 588 (La.App. 3rd Cir. 1970), on the basis that plaintiff made no formal demand on the insurer to pay and is therefore precluded from the benefits of LSA-R.S. 22:658.
It is significant that in each one of defendant's cases the trial judge declined to assess the penalties whereas in the instant case he found that defendant's failure to pay was arbitrary, capricious and without probable cause. Such a determination is based at least in part on the facts and the trial judge's factual determinations are not to be disturbed unless manifestly erroneous.
The record shows that a few days after plaintiff's last operation when he returned to work defendant simply stopped compensation payments but not on the basis of any medical report or testimony that plaintiff was no longer disabled from the performance of his duties. There is no evidence that Dr. Day ever advised defendant that plaintiff could return to work. In fact, he could not have given such advice because as of the date when he last saw plaintiff, almost nine months before defendant stopped paying compensation benefits, Dr. Day recognized the necessity for further surgery on plaintiff. His statement of plaintiff's condition at the time of trial quoted above was apparently based upon an examination conducted on the day of the trial and was unrelated to defendant's decision to stop compensation payments to plaintiff. Dr. McKee's testimony is to the effect that he never discharged plaintiff and he was at least partially disabled at the time. Plaintiff's employer knew that plaintiff was not able to operate the crane and this knowledge must be imputed to defendant. Thus while there may have been a bona fide dispute as to the extent of plaintiff's disability, there was no such dispute over his partial disability. This takes the case out of the purview of Martin v. Travelers, supra, and brings it within the ambit of the rule found in Breen v. Bituminous Casualty Co., 249 So. 2d 338 (La.App. 4th Cir. 1971), where it was held that an insurer's action in cutting off weekly benefits knowing that the employee is at least partially disabled is arbitrary and warrants the imposition of the statutory penalties.
Also, unlike those cases where claimants were encouraged by their treating physicians to return to work Dr. McKee felt that plaintiff "was just going to have to wait and see" if he could operate the crane at the time plaintiff returned to work.
We have already found that plaintiff did not return to the same job after his injury so that Miller v. General Chemical Division, supra, is inapposite. While the defendant would convey the impression that its information was to the effect that plaintiff returned to his regular duties when it stopped paying compensation, this is entirely inconsistent with the testimony of plaintiff's employer to which we have already made reference and the curious behavior of defendant as testified to by the employer that he could not recall ever being contacted by his insurance carrier or visited by an adjuster with reference to the accident. Under these circumstances, defendant's cutting off benefits was arbitrary, unreasonable and capricious.
In the case of Parish v. Standard Accident Insurance Company, 158 So.2d 892 (La.App. 3rd Cir. 1963), the court held as follows:
"(1) The circumstance that an orthopedist, examining the claimant two months prior to the termination of compensation, thought the claimant might return to light work, does not excuse the termination of compensation, especially since the *542 orthopedic opinion showed indefinite continuing disability to do heavy work. Cummings v. Albert, La.App. 1 Cir., 86 So.2d 727.
"(2) Nor, if the termination was based upon the claimant's having returned to work for a short time on a trial basis (during which period he suffered severe pain), nevertheless the defendant-insurer was thereafter put on notice of continuing disability through the receipt of undisputed subsequent medical reports to this effect, and the insurer's failure to reinstate compensation then is regarded as arbitrary and as requiring the imposition of penalties. Seal v. Lionel F. Favret Co., 238 La. 60, 113 So.2d 468."
The instant case is analogous. Dr. McKee's opinion showed plaintiff's indefinitely continuing to operate the crane and his attempts to do so on a trial basis were followed by his employer's being put on notice that such attempts were unsuccessful.
The same result was reached by this Court in Stephney v. Robertson, 219 So.2d 9 (La.App. 4th Cir. 1969), where the employee returned to work doing odd jobs after an injury "as soon as the doctor told him it was all right to do light work." Since there was no explanation for the compensation payments being stopped we held that the insurer acted arbitrary, capriciously and without probable cause.
Finally, defendant's complaint that it did not receive formal demand does not excuse its actions. On January 24, 1972, over a month before suit was filed defendant's agent received a bill for plaintiff's medical treatment from Ochsner Clinic and returned it with the message:
"The Main Insurance Co. of 325 So. Wacker Drive, Chicago, Illinois, have advised that they have paid the maximum limits under the La. Workmen Compensation Act and will not honor any other bills at this time."
In response to plaintiff's suit filed on February 29, defendant filed a general denial. Under these circumstances the formal demand and delay would have been a useless formality. See Antoine v. Houston Fire and Casualty Company, 232 So.2d 588 (La.App. 3rd Cir. 1970).
In addition, defendant complains that plaintiff is not entitled to the medical expenses for which it was cast in judgment because this exceeds the maximum established by LSA-R.S. 23:1203. Under this statute the Court is invested with discretion to require payment beyond that maximum where the employee is subjected to undue and unusual hardship. There is no showing that there was any abuse of the trial judge's discretion in this connection. Defendant takes particular issue with one item of these expenses in the amount of $708.05 for transportation for nurses, but there is sufficient evidence to show that plaintiff incurred this expense in connection with his initial hospitalization in Belle Chasse, that he required the services of nurses, that such services were not available in that area, and that it was necessary to secure these services from New Orleans with attendant transportation expenses. We see no error in the trial court's allowance of the item. But the trial judge erroneously assessed the 12½% penalty on the entire amount due plaintiff including the medical expenses. Since the award of these medical expenses was within his discretion, this amount was not owed by defendant until trial so that it cannot be said that defendant's refusal to pay this portion of the claim was unjustified.
Also the trial judge erred in awarding 8% interest on the past due installments, necessitating an amendment of the judgment so as to allow only 7% interest as authorized by LSA-C.C. Art. 2924.
Accordingly, the judgment appealed from is amended in that 1) the 12½% penalty is restricted to that portion of the judgment excluding the $3,621.38 for medical *543 and drug bills, and 2) interest at the rate of 8% per annum on each past due installment as provided for in the judgment is fixed at the rate of 7% per annum. In all other respects the judgment is affirmed and the costs of this appeal are to be borne by defendant.
Amended and affirmed.